# KINNEY v. HYNDS.

GAMING — CONTRACTS — NEGOTIABLE INSTRUMENTS — MONEY LENT
OR ADVANCED — CONSTRUCTION OF GAMING STATUTES — PUBLIC
POLICY — INTERPLEADER — INTEREST.

1.  If the sole consideration for the indorsement and transfer of
    a certificate of deposit is money won·at gambling, the indorse-
    ment·is void, and the property in the certificate remains in the
    one so indorsing and transferring it.   (R. S. Sec. 1001.)

2.  A licensed faro game was carried on by T. & M. in the
    saloon of B. & R., the latter having no interest in the gam-
    bling.   K. lost some money playing faro, and then borrowed
    $25 from a friend, expending part of it for drinks at the bar,
    and losing the remainder at the ̀game.   Afterward K. re-
    quested R., one of the proprietors of the saloon, to cash a cer-
    tificate of deposit for him.   R. consenting, K. indorsed the
    certificate; R. indorsed it with firm name of B. & R., and not
    having the money, obtained it from M., who was dealing the
    faro game, and who was one of the firm conducting it, deliv-
    ered the certificate to M. and handed the money to K., who
    disposed of it in paying the money borrowed, buying drinks
    for himself and others, and playing faro, most of it being lost
    at faro.   Two other certificates were cashed in the same
    manner, and the money lost mostly at faro, but partly ex-
    pended for drinks.   A fourth certificate was cashed for K. by
    M. directly, and a portion of the money was lost at the game,
    and a part expended for drinks, and K. had some of the
    money when the game closed.   It was not unusual for the
    saloon or gaming proprietors to cash checks after banking
    hours for accommodation.   When the .certificates were
    cashed K. had not made any bets upon credit, and did not
    owe the game or the saloon for any money won.   The certifi-
    cates were cashed for their face value, and no amount was
    held back in payment of any debt.   Held, that the considera-
    tion for the indorsement and transfer of the certificates was
    not money won at gaming, and the indorsements are not for
    that reason void.

3.  The fact that part of the proceeds of the certificates, so
    cashed, was used to repay an acquaintance money borrowed
    from him during the same evening, and lost at gambling, does
    not render the indorsements void under the statute; for it can
    not be said that a contract made to obtain money to repay the
    loan had for its consideration money won at gaming.

4.  To bring a case within that part of the statute (R. S., Sec. 1001), making void all contracts for the reimbursing or paying any money or property knowingly lent or advanced at the time and place to a person engaged in gambling, there must be contemplated a return or repayment in some form.

5.  "Money lent" is an expression which has no different legal or technical definitions from that in which it is popularly understood. It means a delivery of money to another to be returned or repaid, and differs from the lending of any other property in that it is not ordinarily expected that the identical money will be returned, and also that ordinarily in the case of a loan of money some compensation is provided for in the way of interest or otherwise; while the lending of other property for a compensation is termed a "hiring" or "letting."

6.  To "advance" money is to pay it before it is due, or it is to furnish money for a specified purpose understood between the parties; the money or some equivalent to be returned.

7.  The mischief sought to be guarded against by that part of the statute invalidating contracts "for the reimbursing or paying" money lent or advanced was to protect persons against using their credit and incurring debt under the fever and excitement of gambling.

8.  As the certificates were not pledged and were not to be redeemed, and there was to be no return or reimbursement or payment of the money obtained by the indorser thereof, the transaction was the exchanging of them for money. It was not a loan or an advance, nor did the indorser contract for the reimbursing or paying of any money.

9.  The statutes (R. S. Secs. 1460, 1462) providing for licensing the carrying on of certain gambling games, and authorizing the licensee to carry on the games mentioned, authorize and entitle the licensee to carry on the game for the ordinary purposes for which such a game is conducted; that is, to win money or property staked, and to retain it as his own.

10.  An act expressly authorized by a valid statute can not be said to be illegal or contrary to public policy. As to gambling, the legislature had the right to declare the public policy of the State, and what should be legal in the premises; and that it is a very bad public policy, and a relic of a condition of society no longer existing in the State, does not affect the validity of the statute.

11.  In view of the statutes authorizing the licensing of certain games, including faro, and in the absence of a statute author-

izing the recovery by the loser of money lost at gaming; money or property lost at faro and paid over can not be recovered back by the loser.

12.  Suit being brought upon the certificates against the bank issuing the same, and the original holder having been substituted as defendant, the bank having been ready and willing at all times to pay to the proper party; the plaintiff having taken them with notice of their dishonor, in payment of an antecedent debt, and the certificates expressly ceasing to draw interest after maturity, the plaintiff can not recover interest after the maturity of the certificates, from the substituted defendant.

### ON REHEARING.

1.  The statutory proceeding (R. S., Sec. 2405) for requiring a claimant to appear and maintain or relinquish his claim against a defendant is a substitute for the equitable interpleader, but is not exclusive. The code contemplates in its effects and consequences the same thing as the equitable interpleader, when its provisions in that respect are invoked.

2.  In a suit by an indorsee upon a certificate of deposit against the issuing bank, the issue between the plaintiff and a claimant of the certificate who is substituted as defendant, is the ownership of the certificate and the right to receive payment from the bank, and in this case to the fund represented by the certificate; and the plaintiff is not entitled to a judgment against the substituted defendant for a greater amount of interest than the bank is liable for.

3.  The bank — the original defendant, having been ordered by the court to retain the money, the effect is the same as if the money had been deposited in court or with some other person, except to delay the time for the final discharge of the bank.

[Decided July 7, 1897.  Rehearing denied April 19, 1898.  Commenced in District Court February 16, 1891.]

ERROR to the District Court for Sweetwater County, HON. JESSE KNIGHT, Judge.

Action upon certificates of deposit.  The defendant bank made affidavit that they were claimed by a third party, and the latter was ordered to appear and maintain or relinquish his claim.  He appeared and answered, and

the case proceeded as against him, the bank retaining the money in the meantime by order of the court. The facts are stated in the opinions.

*N. E. Corthell*, for plaintiff in error.

The indorsement and transfer of the certificates of deposit was for a gambling consideration, and therefore void. (R. S., Sec. 1001; Bank v. Bank, 38 Fed., 800; Bank v. Portner, 46 O. St., 381; Fuller v. Hutchings, 10 Cal., 523; Mechanics etc. Co. v. Duncan (Tex.), 36 S. W., 887; Nave v. Wilson (Ind.), 38 N. E., 876; Chapin v. Dake, 57 Ill., 295; Flagg v. Baldwin, 38 N. J. Eq., 233; Pope v. Hanke, 155 Ill., 617; Buckman v. Bryan, 3 Denio, 364; Morgan v. Graff, 5 id., 364; Barnard v. Backhaus, 52 Wis., 593; Love v. Harvey, 114 Mass. 80; Hatch v. Borroughs, 1 Woods, 448; Taylor v. Beck, 3 Rand, Va., 316; Roberts v. Taylor, 11 Ala., 656; Williams v. Wall, 6 Mo., 318; Mallett v. Butcher, 41 Ill., 385; Tenney v. Foote, 95 id., 99; West v. Carter, 129 id., 253; Williams v. Judy, 3 Gilm., 282; Unger v. Boos, 13 Pa. St., 601; Rick v. Briggs, id., 340.) Is the claim within the statute allowing interest? (R. S., Sec. 1313; 153 Mass., 143; 34 Atl., 788; 42 Pac., 1024.)

The fact that only part of the money advanced upon the certificates was lost at gaming would not legalize any part of the contract. (Koster v. Seney (Ia.), 68 N. W., 824; Valentine v. Stewart, 15 Cal., 387; 36 S. W., 890; 95 Ill., 99.) It is not required that the money be staked upon the game. It is sufficient if the player is engaged at gaming and the money is advanced at the time and place, etc. (R. S., Sec. 1001.) The fact that the game was licensed does not legalize the contract. (Gibbon v. Gouvenier, 1 Den., 170; Ruckman v. Ryan, id., 340; 1 N. Y., 392; 24 S. W., 992; 20 Tex., 750; 25 id., 587; Bryant v. Mead, 1 Cal., 441; Carrier v. Brannan, 3 id., 328; Scott v. Courteney, 7 Nev., 419; R. S., Sec. 2840.) An innocent holder is not protected. (6 Wend. 613; 21 Ga., 195; 70 N. C., 191; 5 Mass., 286; 21

Ind., 88; 27 Fed., 909; 57 Ill., 296; 41 id., 384; 84 id., 292; 13 Pa. St., 601; 36 Miss., 690; 3 Gilm., 282; 2 Strange, 1155; 2 Doug, 736; 21 N. E., 634.)

*W. R. Stoll,* for defendant in error.

There is no evidence that there was any money lent or advanced to Kinney upon the certificates. The fact that a loan is made to, or a contract entered into with, a person engaged in gambling, at a time and place where such games of chance are being played, is not sufficient to affect such loan or contract with a gaming consideration. (Roberts v. Blair, 11 Colo., 64; Tyler v. Carlisle, 79 Me., 210; Hoyt v. Cross, 108 N. Y., 76.)

The fact that a loan is made to a person engaged in playing at cards, or that a contract is entered into with him to supply him with funds with which to gamble, is no defense in an action to recover the sum so loaned or contracted for, even though the one loaning the money knew that the funds so advanced would be used in gambling. The rule is the same if the one making the loan was a participator in the game. (79 Me., 210; 3 Cliff., 494; 32 Vt., 110; 50 N. H., 253; 3 Den., 107; 3 Metc., 207; 47 Me., 58; 39 Cal., 345; 73 Cal., 411; 33 Mich., 469; 114 Pa. St., 422; 26 N. E., 568.)

It is only when the money is loaned by one who is himself *particeps criminis*, that the defense can be set up. (Cases above cited; 25 N. E., 430.) On petition for rehearing, counsel contended that the plaintiff — defendant in error here—was entitled to interest upon the certificates after their maturity from Kinney, the substituted defendant. In this connection counsel argued that Kinney did not stand in the place of the bank; that the statutory interpleader is not exclusive, but accomplishes the same result as interpleader in equity. The issues between the plaintiff and substituted defendant in such case may be different from the issues between the original parties— citing Willson v. Salmon, 45, N. J. Eq., 257; R. S., Sec. 2405; 11 Ency. L., 494–504; 1 Kinkead's Code, Pl., Sec.

727, 728; 1 Fost. Fed. Pr., Sec. 88; Story's Eq. Pl., 296, 297. That interest was allowed under Sec. 1313, R. S., as the money was due plaintiff from Kinney—for, to all intents and purposes it was retained by the latter— citing Rector v. Mark, 1 Mo., 288; Moreland v. Lawrence, 23 Minn., 84; 18 N. Y., 35; 38 N. J. L., 531; 75 Ill., 554; 30 Ala., 668; 1 La. Ann., 325; 1 How. Miss., 230; 2 B. Mon., 404; 62 Me., 54; 108 Pa. St., 55; 27 Hun, 236; 64 Ind., 220; 8 N. W., 448; 60 Miss., 39; 11 N. E., 799; 44 Pac., 1079; 8 Ency. L., 1196. Whenever a person assumes the attitude of a litigant, he is liable for interest. When interest is due by the non-payment of the principal at maturity, or upon demand when a demand is necessary, it is not necessary to specially claim interest in the petition. (2 Scam. 313; 2 Woods 463; 2 Dan'l. N. Inst., 1458; 1 How. Miss., 230.) While it is true that where there is a fund in court to which there are adverse claims, and the court retains the fund until some question is decided relating thereto, interest may not always be allowed; it will, however, always be allowed against a party litigant who claims the fund and whose claim to the same necessitated the litigation where such party is not entitled to the same. (Sleppy v. Bank, 17 Fed., 712; Sibley v. Eq. Life Soc.; 3 N. Y. Supp., 8; Converse v. Ware Sav. Bank, 152 Mass., 407; Ins. Co. v. Bank (Ky), 19 S. W., 841.)

CORN, JUSTICE.

The defendant in error brought suit in the district court of Sweetwater County against the First National Bank of Rock Springs, upon four certificates of deposit issued by the bank to M. Kinney, the plaintiff in error. The bank filed its affidavit under the statute showing that Kinney claimed the money due upon the certificates, and averring its readiness to pay the same as the court might direct. Kinney subsequently appeared and was substituted as defendant in place of the bank. The cause was tried by the court without a jury, and judgment rendered for the

plaintiff below for the amount of the certificates with interest to the date of the judgment.

The evidence, about which there is no dispute between the parties, shows that in October, 1890, Bingham & Rumpf were the proprietors of a saloon in the town of Green River. That in the same room where the bar or counter was, Turpin & Mc Donald were carrying on a licensed faro game and a licensed game of roulette. Bingham & Rumpf, the saloon-keepers, had no interest in the gambling, Turpin & Mc Donald simply having a place in the saloon for their games, paying no rent. On the night of the transactions out of which this suit arises, Kinney, the plaintiff in error, was in the saloon playing at faro, and drinking.. He lost at the game, and then borrowed $25.00 from an acquaintance named Sowadski, which he also lost and expended in drinking and treating others. Afterward he requested Rumpf, who was attending the bar, to cash one of the certificates in question for him. Rumpf had him indorse the certificate, indorsed it himself with the firm name of Bingham & Rumpf, and not having the money himself, obtained it from Mc Donald who was dealing the faro game, delivered the certificate to Mc Donald and handed the money to Kinney, the certificate being cashed at its face value. This money was disposed of in paying the money borrowed, buying drinks for himself and others, and playing faro — most of it being lost at the faro game. Two others of the certificates were cashed in precisely the same way and the money lost principally at the faro game, some of it being expended for drinks. The fourth certificate was cashed for Kinney by Mc Donald directly — Kinney indorsing it and delivering it to him, and he giving to Kinney its face value in money. A portion of this also was lost at the game and expended for drinks, but just how much does not appear from the evidence, as Kinney had some money when the game closed. Kinney was in the saloon five or six hours that evening, being out three or four times, but most of the time in the saloon. Three of the certificates

are indorsed " M. Kinney," and " Bingham & Rumpf." The fourth for $134.60 is indorsed " M. Kinney " and " John Mc Donald."

Several defenses are set up, though they are not very definitely separated in the answer.   The first is a general denial that the plaintiff acquired any ownership or interest in the certificates.   The second sets out that the indorsement and delivery of the certificates was procured by means of fraudulent devices and cheating in connection with the faro game, that the game was played unfairly and unlawfully, and was what is termed a " brace " game.

What is numbered as the third defense sets out first that the consideration for the indorsement and transfer of the certificates was money won from the defendant at faro; and second, that the consideration for such indorsement and transfer was for reimbursing money and faro chips knowingly advanced by Mc Donald and Bingham & Rumpf to Kinney for the purpose of betting upon the game, and that the money and chips were employed for that purpose, and that Kinney was engaged in playing the game when the advancements were made.

This case is involved in some difficulty from the fact that our statutes upon the subject of gambling are entirely out of line with the legislation of most of the other States. In England and in the States, to whose decisions we are cited as authority by counsel, gaming and the keeping of gaming houses are criminal offenses and visited with heavy penalties.   In this State these acts are permitted by law, and what are known as banking games, including faro and roulette, are licensed.   Secs. 1459 and 1467, Rev. Stat., prohibit gaming without a license, and designate what games may be licensed.   Secs. 1460 and 1462 provide how a license may be obtained and protect the licensee from prosecution.   Sec. 1468 provides a penalty for playing unfairly with the intention of winning in any way more than the fair percentage of the game. Sec. 1001 is as follows :

" All contracts, promises, agreements, conveyances,

securities, and notes made, given, granted, executed, drawn, or entered into, where the whole or any part of the consideration thereof shall be for any money, property, or other valuable thing won by any gaming, or by playing at cards, or any gambling device or game of chance, or by betting on the side or hands of any person gaming, or for the reimbursing or paying any money or property knowingly lent or advanced at the time and place of any such play, to any person or persons so gaming or betting, shall be utterly void and of no effect. No assignment of any bill, bond, note, or other evidence of indebtedness, where the whole or any part of the consideration for such assignment shall arise out of any gaming transaction, shall in any manner offset (affect) the defense of the person or persons making, entering into, executing, or giving such instrument so assigned, or the remedies of any person interested therein."

The second defense, that the game was unfairly dealt, entirely failed upon the proof, and it is conceded by counsel for the plaintiff in error that the evidence shows that he was given a fair deal, and that the game was up to the recognized standard of a "square faro game" under the laws and customs of the gambling fraternity.

Under the third defense it is alleged that the indorsement and transfer of the certificates was made for "the sole consideration of money won from the defendant by one Mc Donald." If the evidence sustains this allegation, then the indorsement is void under the statute, and the property in the certificates remains in Kinney. The evidence shows clearly that upon the cashing of each of them Kinney was paid the face value in money. He was at liberty to do with it as he pleased. The evidence shows that it was not an unusual thing for the proprietors of the saloon or the gambling tables to cash checks or other papers after banking hours as a matter of accommodation. There is nothing tending to show that at the time he cashed any one of the certificates, Kinney had make any bets upon credit, or that he owed the game, or Bingham

& Rumpf, for any money won by any of them. Certainly upon the face of the transaction the consideration for the indorsement and transfer was the payment in money of the full face value of the certificates. There is no intimation anywhere in the evidence that in cashing the certificates any amount was held back or kept out in payment of any debt whatever. The evidence does show that after cashing one of the certificates Kinney paid to Sowadski the $25 he had borrowed from him during the evening. It is also probable from the evidence that all or part of this $25 was lost by Kinney at the faro game.

But a contract made to obtain money to repay this loan could not be said, in any possible view of the law, to have for its consideration money won at gaming; no more, I think, than if Kinney had executed his note for $25 at the bank the next day for money to pay the same debt. Rumpf states also that out of the proceeds of one of the certificates Kinney paid him $20 borrowed money. There is nothing in the evidence tending to show that the borrowing of this money was connected in any way with the transactions of that night, or with any gaming transaction. Indeed, as neither Kinney nor any of the other witnesses makes any mention of the borrowing of any money from Rumpf that night, it is probable it was borrowed at some other time. I think, therefore, the evidence does not show, or tend to show, that the indorsement or transfer of the certificates "was made for the consideration of money won from the defendant," but tends very strongly to disprove that allegation.

The statute further provides that all contracts, etc., made for the reimbursing or paying any money or property knowingly lent or advanced at the time and place of such play to any person or persons so gaming or betting, shall be utterly void and of no effect. "Money lent" is an expression that is popularly quite well understood, and it has no different legal or technical definition. It means a delivery of money to another to be returned or repaid,

and differs from the lending of any other property in that it is not ordinarily expected that the identical money will be returned, and also that ordinarily in the case of a loan of money some compensation is provided for in the way of interest or otherwise, while the lending of other property for a compensation is termed a hiring or letting. To "advance" money is to pay it before it is due; or it is to furnish money for a specified purpose understood between the parties, the money or some equivalent to be returned.

In every case of either a loan or advancement, as mentioned in this statute, there must be contemplated a return or repayment in some form. This definition is emphasized, and that the words are used in the statute in this sense is made clear by other words employed in immediate connection. For the prohibition of the statute is against contracts "for the reimbursing or paying" money lent or advanced. The intention and purpose of this clause of the statute seems to be quite clear; that having legalized these games in deference to some supposed sentiment or condition of society, and provided that persons might win or lose money or property staked upon them, it was sought to hedge against some of the more pernicious results of such legislation, and guard persons against the greater folly of using their credit and incurring debt under the fever and excitement of gaming. The transaction here as revealed by the evidence does not come within the above definitions nor within the mischief sought to be guarded against. There is nothing in the evidence to indicate that these certificates were pledged, or were to be redeemed, or that there was to be any return or reimbursement or payment of the money obtained by Kinney. The certificates were simply "cashed," the assignees taking them and the indorser the money. The transaction was the exchanging of them for money, similar to the exchanging of a large coin or bank note for smaller ones more convenient for his use. It was not a loan or an advance, nor did the indorser contract for the reimbursing or paying of any money.

But counsel for the plaintiff in error contends that any theory in regard to the advance of money on the certificates is largely artificial and technical, and that in substance and in fact the certificates themselves were lost at the game. He says this is established by the fact that at the beginning Kinney had the certificates and McDonald the money, and at the end McDonald had both money and certificates. It is approximately, though not accurately, true, that at the end of the game McDonald had both money and certificates. But this falls very far short of establishing that the certificates were lost on the game, as distinguished from money lost on the game. So far as the distinction is of any value in the case the evidence shows conclusively that it was money, and not the certificates, that was lost on the game. But it makes no difference. If certificates so lost are recoverable by the loser, so is money as well. I am unable to discover any difference in that respect, or any advantage that the law gives to the one over the other.

Is then money or property lost at faro and paid over recoverable by the loser in this State? Plaintiff in error contends that it is, and relies upon Sec. 1001 of the statute, and adds further: "The substantive law invoked is of long standing, and was an early enactment in the statutes of England and of many of the States, where it has received a uniform and unvaried construction adapting and applying it to every device and subterfuge which the ingenuity of gamblers could invent in the vain hope of defeating a wise public policy." And we are referred to a great many cases in support of the claim of the plaintiff in error that it may be so recovered. These cases, with three exceptions, are from States where gambling and the keeping of gaming houses is unlawful. They are in no sense parallel, and furnish very slight assistance in determining the question here at issue.

We are specially referred, however, to three cases, Bryant v. Mead, 1 Cal., 441; Carrier v. Brannan, 3 Cal., 328; and Scott v. Courtney, 7 Nev., 419, which, it is urged, were "in regard to a licensed faro game and

3

under a statute the same as ours." Each of these cases was a suit by the keeper of a licensed gaming house against a player for money won from him at faro but not paid. And in each of them it was decided that a statute authorizing the granting of a license to carry on a faro game should not be construed as conferring a right to sue for a gaming debt, but as a protection solely against a criminal prosecution, there being no statute in those States prohibiting the recovery of money won at play but not paid. As Sec. 1001 of our statute, already quoted, expressly provides that all contracts where any part of the consideration thereof shall be for any money or property won by any gaming shall be utterly void and of no effect, thus settling by statute the very question at issue in those cases, it is a little difficult to see why they should be relied on as decisions, "under a statute the same as ours"; and especially when the question there decided is entirely different from the case at issue here.

We have no statute authorizing the recovery by the loser of money lost at gaming, and it could not be recovered at common law. Nor is it recoverable as illegal or contrary to public policy in this State. The price provided to be paid for a license to carry on one of the permitted games is not a mere tax. Sec. 1462 provides that each license shall contain a description of the room in which the game is to be carried on, and shall by its terms *authorize* the licensee to carry on one of the games mentioned, specifying it by name, in the room described therein for the period of three months. And it further provides that the licensee shall be *entitled* to carry on two or more games in the same room by paying a license for each game so carried on. This language, in my opinion, does not admit of any other construction than that the licensee is authorized and entitled to carry on the game for the ordinary purposes for which such a game is conducted; that is, to win money or property staked and to retain it as his own. It is absurd to say that an act expressly authorized by statute is illegal or contrary to

public policy. The legislature had the power to declare the public policy of the State and what should be legal in the premises, and it has done so. That it is a very bad public policy and a relic of a condition of society no longer existing in this State does not affect the validity of the statute.

But the court below gave judgment against the defendant for interest. The plaintiff took these securities with notice of their dishonor in payment of an antecedent debt and stands in no better condition than the original indorsees. The plaintiff in error was a substituted defendant standing in the place of the bank, the maker of the certificates. The bank has held itself in readiness at all times to pay to whomever should be found entitled to receive payment, and is liable on its contract only for interest to the maturity of the certificates at the rate of six per cent per annum. The suit being upon the certificates, and they ceasing to draw interest at maturity, six months from date, there is nothing in the pleadings upon which to base a judgment for interest against the plaintiff in error.

Moreover, this was not money loaned or due and withheld by unreasonable delay of payment, or money received to the use of another, which would bear interest under the statute. The evidence shows, and we have decided, that this transaction was not a loan to the plaintiff in error. If it were, under the statute, there could be no recovery of either principal or interest. If this were a suit against plaintiff in error upon his indorsement, a different question would be presented; though we are not prepared to say that our conclusion from the evidence would be different. Under the case as presented here, however, it is clear that the plaintiff in error is not liable for interest as such. Interest at the legal rate is adopted in many cases as the only available measure of damages, and if it were allowed in this case, it could only be by way of damages. Damages are not claimed; there is no allegation in the pleadings upon which a claim for

damages could be based, and it is not a case in which damages should be awarded.

The cause is remanded with instructions to the court below to enter judgment in favor of the plaintiff for the sum of $452.37, being the amount of said certificates with interest at the rate of six per cent per annum for the period of six months, ordering the First National Bank of Rock Springs to pay said amount forthwith to the plaintiff, Harry P. Hynds, with judgment against the defendant, M. Kinney, for costs of the action.

*Modified.*

CONAWAY, C. J., and POTTER, J., concur.

---

### ON PETITION FOR REHEARING.

### (October Term, 1897.)

POTTER, CHIEF JUSTICE.

The defendant in error applies for rehearing as to that portion of the judgment of this court relating to interest. We held that it was erroneous to include interest in the judgment, and the trial court was directed to enter judgment in favor of defendant in error for his claim without interest.

The defendant in error was plaintiff below, and brought his action against the First National Bank of Rock Springs upon certain certificates of deposit issued by said bank to the plaintiff in error, and which by indorsement and delivery for value, had come into the possession of defendant in error. The defendant bank, without answering, filed an affidavit setting forth that one M. Kinney (plaintiff in error) without collusion with the defendant makes a claim to the certificates of deposit, and the moneys due thereon, and that defendant is ready to pay the same as the court may direct; and prayed that upon compliance with such order as the court may make in the premises it should be discharged from all liability to the parties.

The court, thereupon, ordered that the bank safely keep the sum of money mentioned in the petition as due on February 12, 1891, viz., $457.77, and interest thereon from that date, subject to the further order of the court; that the said Kinney appear within thirty days, and maintain or relinquish his claim against the defendant, or be forever barred of all claim in respect to the said certificates of deposit.

The affidavit was filed and the order made in pursuance of the provisions of the code (Sec. 2405, Rev.. Stat.), which are as follows : "Upon affidavit of a defendant before answer, in an action upon contract, or for the recovery of personal property, that a third party, without collusion with him, has or makes a claim to the subject of the action, and that he is ready to pay or dispose of the same as the court or judge may direct, the court or judge may make an order for the safe keeping, or for the payment or deposit in court of the subject of the action, or the delivery thereof to such person as the court or judge may direct, and also an order requiring such third party to appear in a reasonable time and maintain or relinquish his claim against the defendant; and if such third party, having been served with a copy of the order, by the sheriff or such other person as the court or judge may direct, fail to appear, the court may declare him barred of all claim in respect to the subject of the action against the defendant therein; but if he appear, he shall be allowed to make himself defendant in. the action, in lieu of the original defendant who shall be discharged from all liability to either of the other parties in respect to the subject of the action, upon his compliance with the order of the court for the payment, deposit, or delivery thereof."

The plaintiff in error appeared and filed an answer to the original petition, none other being filed by the plaintiff.   Such original petition was filed February 16, 1891, and was in the usual form for recovery upon commercial paper.   The prayer was for judgment against the defendant bank for $457.77, the amount due February 12, and

interest thereafter. The answer of plaintiff in error denied that defendant in error was the owner of the certificates. The defenses therein contained, which were interposed for the purpose of impeaching the transactions out of which arose the transfer of the certificates by Kinney, are stated in the former opinion.

A reply was filed in which defendant in error, after denying the allegations of the answer, prayed, "as prayed in the petition herein."

The order of the court that the bank retain the money due upon the certificates, was evidently deemed sufficient to secure the safety of the fund, and had the same effect as if the money had been deposited in court or with some other person, except possibly to delay the time of the final discharge of the bank.

From a journal entry brought into the record it seems that at the trial judgment had been originally rendered against the bank, from which the latter brought error to this court, and upon stipulation an order was entered here that the judgment be vacated, and such a judgment rendered against the substituted defendant as shall seem proper to the district court. Thereafter the judgment was rendered which is involved in the present proceedings in error. The court found for the defendant in error (plaintiff below), generally, and that he was the owner of the certificates of deposit, and that there was due from the substituted defendant upon the causes of action set forth in the petition $652.89. Judgment for the amount was awarded plaintiff against the substituted defendant; the bank was ordered to pay the plaintiff the sum of $457.21, and the balance, $195.68, and the costs amounting to $121.95, remained as a judgment against the substituted defendant.

The question in the case is not, as counsel for defendant in error seems to consider, whether Kinney would have been under any issue which might have been presented bound to respond for interest. It is whether under the issues in the present case as they were framed and tried between these parties interest was recoverable.

The proceeding allowed by the code is a substitute for the equitable action of interpleader. The authorities hold that it is cumulative and not exclusive. The code proceeding is not authorized until a suit has been brought against the person holding the property or fund. The bill of interpleader in equity might be brought by such person in the absence of any suit against him, to compel the adverse claimants to interplead and settle the matter in a controversy between themselves. In such a suit, after the order had been made requiring the claimants to appear and interplead proper issues by pleadings would be framed, and upon those issues their respective rights would be determined.

The code contemplates in its effect and consequences the same thing when its provisions in that respect are invoked. No statutory provision, however, is made as to the course to be pursued in the framing of the issues subsequent to the order against the third party — the adverse claimant. It is said in Moak's Van Santvoord's Pleadings (3d Ed.), p. 358, that no case has been found upon the question, but the author's view is that, analogous to the practice in connection with the bill of interpleader, the plaintiff should be allowed to serve an amended complaint alleging also the facts occurring after the former complaint. The amended complaint would contain essentially the allegations of the former, and further allegations showing the interpleader proceedings. The author's view is that such amended complaint should then demand judgment, that the plaintiff is entitled to the fund deposited or held under the court's order, or the property specified in the complaint, and that he recover costs. After that work was published, the precise question was decided by the Supreme Court of New York, under a similar statute. The trial court had overruled a motion of the substituted defendant to dismiss the plaintiff's complaint (the one originally filed), on the ground that it did not state any cause of action against him. The Supreme Court held the ruling to be error. The court said, "Notwithstanding such appearance and submission to the juris-

diction of the court, the defendant, Lawrence, was not debarred the right to raise at the trial the question that the plaintiff's complaint did not state any cause of action against him, and that, admitting every fact therein stated to be true, no judgment could be obtained in the action against him.    This objection was clearly well taken, and the motion to dismiss said complaint was erroneously overruled.''    Wilson v. Lawrence, 8 Hun., 593, 596. In a case somewhat analogous the same view seems to have been taken by the Supreme Court of Kansas, in Furrow v. Chapin, 13 Kan., 107, although the claimant was not substituted for the original defendant, but merely made an additional party defendant.    Judgment was rendered against both defendants, a sheriff and plaintiff in execution.    It was held erroneous because the petition had not been amended after the introduction of the new party, and nothing was alleged as against him.    In the case at bar, trial was had upon the original petition without objection.    Had there been an amended petition, however, the issues would have been the same as those upon which the cause was tried.    What were those issues?    It is probably true, as stated by counsel, that the cause of action remained the same.    It was held in Ohio under the same code provision that the case after the substitution of the new party defendant remained a civil action, and the parties were entitled to a trial by jury.    Maginnis v. Schwab, 24 O. S., 336.    That case did not involve the question before us, but its facts illustrate the issue presented in such a proceeding.    The suit was upon a promissory note for $1,704.88.    The original defendant paid $1,250.00 on the note, and then filed an affidavit of interpleader under the code, stating that certain third parties claimed the balance, $454.88.    The money was paid by him into court, and upon order of the court the third parties named were made defendants, appeared and filed an answer and cross-petition.    The original petition does not seem to have been amended, nor any objection made to it.    A verdict was returned and judgment rendered in

favor of the plaintiff for the precise amount deposited in court, $454.88, and no interest was included.

It is conceded in the case at bar that the bank was not liable for interest after it retained the money by order of the court. The fund is treated as in court and subject to its order. The issue between the plaintiff and substituted defendant was clearly the ownership of the certificates, and as growing out of such ownership the right of either party to the fund which they represented. The question was which party is entitled to recover of the bank. The bank placed itself in a position to defeat any further obligation than to pay the amount deposited with itself to the one entitled to receive it. No other issue was presented. Kinney was not sued upon his indorsements nor for damages for withholding the money. He did not withhold the money. He was not sued upon the certificates. The bank who had issued them was sued upon them. The court was called upon to determine, not whether Kinney was liable to Hynds upon the certificates, but to whom was the bank liable upon them. A liability to one of the two was admitted by the bank. The amount of the liability was also admitted, and that amount in money was placed subject to the disposition and order of the court. The extent of the bank's liability was then absolutely determined. Nothing remained undetermined but the question as to the party entitled to recover. Either Kinney or Hynds, as owner of the certificates, had a right of recovery against the bank upon them. As against both of said parties the bank had in pursuance of the statute limited its liability to the amount held under the court's order. It is not possible to conceive of any other issue in the case between Kinney and Hynds than the one involved in the question which one is entitled to recover upon the certificates against the maker who was originally sued. As the maximum to be recovered was already settled and fixed by the order of court, it is not perceived how a judgment for any further sum can be awarded.

None of the cases cited by counsel as being analagous seem to support his position. The case of Sleppy v. Bank of Commerce et al., 17 Fed., 712, was a suit to recover the possession of a certificate of deposit, and damages were allowed for its detention.

In Sibley v. Equitable Assur. Soc., 3 N. Y. Supp., 8, the interest held recoverable against the insurance company was upon the sum due under a policy which it had retained without commencing an action of interpleader, and was for the interest up to the time when the money was deposited with a receiver by order of court. It was not held that any interest after such deposit was recoverable against any party to the action.

In Converse v. Ware Sav. Bank, 152 Mass., 407, although a claimant was summoned, the bank remained a party, and retained the money evidently without order of court.

In Kenton Ins. Co. v. Bank, 19 S. W., 841, the bank, it seems, did not stand as an indifferent custodian, but was contesting the right of the plaintiff to the money.

No case has been called to our attention which holds that interest against the substituted defendant in a case like the present is recoverable, and there is no principle of law which authorizes a judgment therefor.

*Rehearing denied.*

CORN, J., concurs.

Knight, J., did not sit in this case.